## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Eastern Outfitters, LLC, *et al.*,[1] | Case No.: 17-10243 (LSS) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF MARK T. WALSH
## IN SUPPORT OF FIRST DAY MOTIONS

I, Mark T. Walsh, declare as follows:

1.       I am the Chief Executive Officer of Eastern Outfitters, LLC ("Eastern Outfitters")
and its affiliates, the debtors and debtors in possession (the "Debtors") in the above-captioned
chapter 11 cases (the "Cases"). I have been employed by the Debtors and their predecessors
since 2008, when I joined the company as Chief Executive Officer.

2.       I have over 25 years of experience in business and finance. Immediately prior to
joining the Debtors, I was a Group President of Liz Claiborne from 2002 to 2008. Prior to that, I
held various roles at J.Crew, PepsiCo, and Deloitte & Touche. I hold a Bachelor's degree in
organizational behavior from Brown University and a Master of Business Administration degree
from The Wharton School at University of Pennsylvania.

3.       On February 5, 2017 (the "Petition Date"), each of the Debtors filed a voluntary
petition for relief with the United States Bankruptcy Court for the District of Delaware (the
"Court") under chapter 11 of the Bankruptcy Code, to commence these Cases. To enable the
Debtors to operate effectively, minimize disruption to their businesses, and maximize the value

---

[1]   The Debtors and the last four digits of their respective federal taxpayer identification numbers, where applicable,
are as follows: Eastern Outfitters, LLC (9164); Subortis Retail Financing, LLC (9065); Eastern Mountain Sports,
LLC (9553); Subortis IP Holdings, LLC; Bob's Stores, LLC (4389); and Bob's/EMS Gift Card, LLC (9618).
The Debtors' executive headquarters are located at 160 Corporate Court, Meriden, CT 06450.

of their assets, the Debtors have filed various applications and motions seeking immediate or expedited relief (collectively, the "First Day Motions"). The relief requested and basis for such relief is described in detail in **Exhibit A**. This Declaration is submitted in support of the First Day Motions, and as additional support for motions, applications, and other pleadings that may be filed on or after the Petition Date.

4.      If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge. During my tenure with the Debtors, I have become very familiar with the Debtors' day-to-day operations, business affairs, financial condition, and books and records. My testimony herein is based on my service as an officer of the Debtors, their affiliates and predecessors, my review of the Debtors' books and records and other relevant documents of which I am custodian, and my review of information compiled and communicated to me, at my request, by other employees of and advisors to the Debtors.

## I.
## PRELIMINARY STATEMENT

5.      The Debtors' operating business consists of Bob's Stores and Eastern Mountain Sports ("EMS"), each of which is a regional multi-channel retailer engaged in the apparel, footwear, and sporting goods lines of business. Both retailers operate a retail store business and an e-commerce business. Collectively, the Debtors currently manage 86 retail stores. The Debtors employ approximately 2600 full, part-time and temporary employees across their operations.

6.      The Debtors, like other retail companies, have faced various obstacles in the current challenging retail environment. Since the Debtors acquired their primary assets out of bankruptcy in July 2016, the Debtors' vendors have imposed very restrictive credit terms, thereby depressing inventories. Significantly, unit inventories in some categories are down as

2

much as 30% since the prior sale closed. Largely as a result of inventory pressure, the Debtors have been unable to meet their sales plan. Facing these operational challenges along with tightening liquidity, the Debtors, along with their advisors, engaged in a robust process to explore and solicit interest in a number of potential alternatives including, without limitation, the sale of all or a material business unit of the Debtors, equity investments in all or a portion of the business, the sale of a brand, a licensing transaction, and potential liquidity enhancing acquisitions that began in September 2016.

7.    Although the Debtors received some interest through their marketing process, by early 2017, the Debtors were still unable to secure a committed transaction that would have provided the Debtors with sufficient capital to continue operations as a going-concern. As a result, in January 2017, in addition to Lincoln's investment banking efforts that were ongoing, the Debtors also retained Malfitano Advisors, LLC ("Malfitano") to serve as asset disposition advisors and consultants to solicit both "equity" and "fee" based liquidation proposals from various national liquidation firms that could handle the disposition of all of the Debtors' assets. Ultimately, Malfitano secured six proposals from three different bidding groups. The proposals either provided for sufficient cash or projected to generate sufficient cash to repay the Prepetition Senior Loan and the potential for a limited recovery for the Prepetition Subordinate Term Loan. However, such proposals would have also resulted in termination of all of the Debtors' employees and limited or no recovery for vendors and other creditors. Absent any committed alternatives, the Debtors began preparations for a chapter 11 filing with the highest and best liquidation proposal they received.

8.    On the eve of commencing the liquidation process, the Debtors received an offer from Sportsdirect.com Retail Ltd. ("Sportsdirect") to purchase substantially all of the Debtors'

3

assets. Sportsdirect is the United Kingdom's largest sporting goods retailer. It offers a wide range of sporting apparel, footwear, and equipment through an on-line retail website, and more than 700 brick and mortar stores worldwide. Through a holding company, Sportsdirect is publicly traded on the London Stock Exchange. It currently has a market capitalization in excess of £1.70 billion. Sportsdirect is also the holder of the Debtors' second lien debt. The Sportsdirect transaction contemplates going concern operations of the Business and continued employment of approximately 1900 of the Debtors' employees.

9.      In order to facilitate the sale of the Debtors' assets, the Debtors, Vestis (defined below), the existing equity owner of the Debtors, and Sportsdirect entered into a letter of intent (the "LOI") on January 27, 2017. Consistent with the LOI, Sportsdirect acquired the Debtors' second-lien debt from Vestis and provided $10 million of emergency, bridge financing to allow the Debtors continued operation while the parties negotiated the purchase transaction.

10.      Since the signing of the LOI, the Debtors and Sportsdirect have engaged in around-the-clock, good-faith negotiations with Sportsdirect's U.S. representatives and consultant Theseus Strategy Group LLC, to fully document the terms of the proposed purchase transaction and a DIP Facility (as defined below). Those negotiations are on-going.

11.      Given their severe financial distress, the Debtors have fallen behind on lease payments due to the landlords of several stores that are critical to the Debtors' ongoing businesses. Several of the leases were at risk of being terminated on February, 6, 2017 in the absence of a bankruptcy filing. While the Debtors would have preferred to completely finalize the documents required for the Sportsdirect transaction and the DIP Facility prior to commencing these Cases, the Debtors ultimately determined it was necessary to commence these Cases without definitive documentation in hand to preserve the critical, at-risk leases and the going

concern value of their businesses. Based on the progress made up to the point of filing, the Debtors are confident definitive documentation will be finalized within a very short time following the filing of these Cases.

## II.
## BACKGROUND

**A.    Overview of the Debtors**

    i.    **Bob's Stores**

12.    Founded in 1954 in Connecticut by Bob Lapidus, Bob's Stores is a value-oriented retailer of apparel, footwear, and accessories for men, women, and children. Spurred by the jeans craze of the 1970's, Bob's Stores experienced tremendous growth within Connecticut and opened multiple store locations. During the 1990's, Bob's Stores grew from five to forty-one stores. In 2003, after experiencing poor financial results, Bob's Stores was purchased by The TJX Companies.

13.    In 2008, Bob's Stores was purchased from The TJX Companies by Vestis BSI Holding, Inc., an affiliate of Versa Capital Management, LLC ("Versa"), the Debtors' current equity sponsor. The resulting turnaround at Bob's Stores was highly successful and the company enjoyed levels of financial success not realized since the early 1990's. Bob's Stores remains the Debtors' most stable brand with consistent historical performance that has provided the infrastructure and management capability for the subsequent growth of the Debtors, as described below.

    ii.    **EMS**

14.    EMS was founded in 1967 by two climbers in Wellesley, Massachusetts, as a technically-focused outdoor gear retailer. After opening a climbing school in 1969, EMS quickly became a leading name in the outdoor market and began its steady expansion of new stores and

5

markets. In the early 2000's, EMS successfully developed a focus on human-powered outdoor sports with the introduction of bikes and increased concentration on climbing and kayaking. Despite a passionate devotion from its customers, EMS began to suffer from poor sales beginning in 2012, at least in part driven by the occurrence of one of the warmest winters on record in 2011-2012.

15.     In November 2012, EMS was acquired by Collis EMS Financing, LLC, an affiliate of Versa. At the time of the acquisition, EMS lacked liquidity, was unprofitable, and suffered from poor sales performance. At the same time, EMS remained a widely-recognized and highly valued brand name in the outdoor and active lifestyle retail categories.

### iii.     Eastern Outfitters and the Debtors' Organizational and Operational Structure

16.     Eastern Outfitters is based in Meriden, Connecticut and provides various operational and corporate support to its Debtor affiliates. The chart attached hereto as **Exhibit B** illustrates the corporate structure of the Debtors as of the Petition Date.

17.     Subortis Retail Financing, LLC, a Delaware limited liability company ("Subortis Retail Financing"), is the sole member and owner of Eastern Outfitters, LLC, a Delaware limited liability company ("Eastern Outfitters"), which is the sole member and owner of (a) Eastern Mountain Sports, LLC, a Delaware limited liability company ("Eastern Mountain"), (b) Subortis IP Holdings, LLC, a Delaware limited liability company ("Subortis IP"), (c) Bob's Stores, LLC, a Delaware limited liability company ("Bob's Stores") and (d) Bob's/EMS Gift Card, LLC, a Virginia limited liability company ("Bob's/EMS Gift Card"). Subortis Retail Financing is privately owned by Subortis Retail Holdings, LLC ("Subortis Retail"), which is indirectly owned by investment funds advised by Versa.

6

18.    Eastern Mountain is the entity that runs the day-to-day operations of EMS' retail business and holds substantially all of EMS' assets and liabilities. Similarly, Bob's Stores is the entity that runs the operations and holds substantially all of the assets and liabilities of the Bob's Stores business. Bob's/EMS Gift Card administer the gift card businesses of their respective retailers.

19.    Debtor Subortis IP currently owns the intellectual property associated with the Debtors' businesses, including trademarks, domain names, and copyrights (collectively, the "Intellectual Property"). Subortis IP subsequently entered into certain license agreements with the respective retailers pursuant to which the retailers license Intellectual Property from Subortis IP.

**B.    The Debtors' Business Operations**

    i.    **Employees and Stores**

20.    As of the Petition Date, the Debtors employ approximately (a) 403 salaried Full Time Employees and 350 hourly Full Time Employees, for a total of approximately 753 Full Time Employees; (b) 1,665 Part Time Employees; and (c) 198 Temporary Employees. In addition, 12 Full Time Employees are currently on leave.

21.    Collectively, the Debtors currently operate 86 retail stores. Bob's Stores operates 35 stores throughout New England, New York, and New Jersey. EMS operates 51 stores, located primarily in the Northeastern states. Bob's Stores has roots dating back to the 1950s, while EMS was founded in the 1960s.

22.    The Debtors maintain their corporate headquarters and a distribution center for Bob's Stores and EMS in Meriden, Connecticut. The brands share certain operational functions in Meriden.

ii.    **The Debtors' Brands**

23.    While certain business and operational differences exist across the two brands, as described below, the Debtors' core brands enjoy a remarkable reputation and deep customer loyalty, and hold strong market positions and brand-level profitability. The Debtors' businesses are seasonal in nature to varying degrees across the two retailers, with a traditional increase in sales during the back-to-school and holiday seasons.

24.    Bob's Stores aims to provide a one-stop-shop for the entire family, with a focus on casual apparel, denim, athletic apparel, workwear, and team apparel. The stores have an extensive footwear selection that boasts over 20,000 pairs of shoes. The stores carry popular brand names, including Nike, Levi's, Under Armour, Carhartt, and Timberland, at moderate price points, as well as Bob's Stores' own private label brands, BCC and Rugged Trails. The Bob's Stores brand is best known for its outstanding branded selection, value, and prices.

25.    EMS is known as a retailer of gear, apparel, and accessories for outdoor activities such as rock climbing, camping, biking, snowshoeing, and kayaking. With a heritage of nearly half a century, EMS provides customers with superior service through knowledgeable, credible and authentic expertise. EMS is an iconic brand in the outdoor sports industry and an established specialty retailer of outdoor gear and apparel. The stores carry popular brand names, including The North Face, Asolo, Oboz, Petzl, Keen, Merell and Thule, as well as EMS's private label brands, such as Techwick clothing, Thunderhead outerwear, Pemi sleeping bags and Velocity tents.

iii.    **E-Commerce and Information Technology**

26.    Prior to the Petition Date, each of the two Debtor retailers operated an e-commerce site: www.bobstores.com and www.ems.com. In 2016, the Debtors collectively generated 10% of their total sales through e-commerce. The Debtors use enterprise-wide ERP

software, whereby the two brands were consolidated onto a single set of information technology platforms for point-of sale, warehouse management, merchandising, and e-commerce.

27.     Debtor Subortis IP owns a portfolio of intellectual property that includes the "Bob's Stores," "Eastern Mountain Sports," and "EMS" trademarks, all of which are registered with the United States Patent and Trademark Office. The Debtors also own a number of domain names and copyrights.

    iv.     **Vendors**

28.     The Debtors have developed a product assortment and shopping experience that highlights a mix of branded and private label merchandise that caters to the Debtors' target customer bases in the apparel, footwear, and sporting goods lines. Collectively, the Debtors offer thousands of products from branded labels, in addition to offering certain private label brands.

29.     Prior to the Petition Date, the Debtors purchased merchandise from approximately 400 different vendors.  The Debtors typically place and pay for orders directly under purchase orders. Although certain of the Debtors' vendors use factors to sell merchandise and/or provide credit insurance, in nearly all instances, the Debtors work directly with the vendors on terms in lieu of an unsecured credit line with the factors.

**C.     Prepetition Capital Structure**

    i.     **Secured Debt**

30.     *The Prepetition Senior Credit Facility (First Lien)*. Each of the Debtors is indebted under a Revolving Credit and Security Agreement, dated as of July 18, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Senior Credit Agreement"), by and among the Borrowers, the lenders party thereto (the "Prepetition Senior Lenders"), and PNC Bank, National Association, as agent (in such capacity, the "Prepetition Senior Agent"). The Prepetition Senior Credit Agreement provides for an asset-

9

based revolving credit facility and swing line credit facility of up to a maximum of $85 million in the aggregate (the "Prepetition Senior Loans"). The Debtors' ability to borrow under the facility is further subject to a borrowing base calculation contained in the Prepetition Senior Credit Agreement.

31.     The Prepetition Senior Credit Agreement provides for a varying interest rate based on the excess availability of Prepetition Senior Loans as well as whether the Prepetition Senior Loans are borrowed in the form of Base Rate Loans or Eurodollar Rate Loans.[2] The Prepetition Senior Credit Agreement also provides for certain other costs and fees. The obligations of the Debtors under the Prepetition Senior Credit Agreement are secured by first-priority security interests in and liens on substantially all of the Debtors' assets, including accounts receivable, intellectual property and other general intangibles, inventory and equipment, deposit accounts, letters of credit, chattel paper, commercial tort claims, and the products and proceeds of the foregoing (collectively, the "Prepetition Senior Collateral"). The Prepetition Senior Collateral does not include certain Excluded Property such as real property leases. The Prepetition Senior Loans mature on July 27, 2020. As of the Petition Date, approximately $41 million in Prepetition Senior Loans were outstanding under the Prepetition Senior Credit Agreement, inclusive of letters of credit issued and outstanding, accrued and unpaid interest, costs, expenses and other fees owed to the Prepetition Senior Agent and Prepetition Senior Lenders.

32.     *The Prepetition Subordinate Term Loan (Second Lien).* Each of the Debtors is also indebted under a Term Loan, Security and Guaranty Agreement, dated as of July 18, 2016 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition

---

[2]  Capitalized terms used but not defined herein shall have the meaning ascribed to them in the respective prepetition credit facility documents.

Subordinate Credit Agreement" and such financing, the "Prepetition Subordinate Term Loan"),

by and among the Borrowers, the lenders party thereto (the "Prepetition Subordinate Lenders"),

and Sportsdirect, as agent (in such capacity, the "Prepetition Subordinate Agent").[3] The

Prepetition Subordinate Term Loan accrues interest at varying rates based on either LIBOR or

the prime rate, plus an Applicable Margin. The obligations of the Debtors under the Prepetition

Subordinate Credit Agreement are secured by second-priority security interests in and liens on

the same collateral that secures the Prepetition Senior Loans (the "Prepetition Subordinate

Collateral"). The Prepetition Subordinate Term Loan matures on the earlier to occur of: (a) July

17, 2020; or (b) the date of termination of the Prepetition Senior Credit Agreement. As of the

Petition Date, approximately $42 million was outstanding under the Prepetition Subordinate

Term Loan Agreement, including accrued and unpaid interest, costs, expenses, and other fees

owed to the Prepetition Subordinate Agent and the Prepetition Subordinate Lenders.

33.    *Intercreditor Agreement*. The relative rights of the Prepetition Senior Lenders and

the Prepetition Subordinate Lenders with respect to the Prepetition Senior Collateral and the

Prepetition Subordinate Collateral are governed by the terms of an Intercreditor and

Subordination Agreement, dated as of July 18, 2016 (as amended, amended and restated,

supplemented, or otherwise modified from time to time, the "Prepetition Intercreditor

Agreement"), by and between the Prepetition Senior Agent and the Prepetition Subordinate

Agent. The Prepetition Intercreditor Agreement provides, among other things, that the liens held

by the Prepetition Subordinate Agent are junior and subordinate to the liens held by the

---

[3] As described above, on January 27, 2017, Sportsdirect took an assignment from Vestis of its rights and obligations under the Prepetition Subordinate Credit Agreement and related documents. Thereafter, Sportsdirect, as Prepetition Subordinate Lender, extended an emergency loan to the Borrowers for an additional $10 million under the terms of the Prepetition Subordinate Credit Agreement which provided the Debtors with sufficient liquidity to continue operations until the filing of these Cases. In connection with this bridge loan, Sportsdirect received second priority liens on certain owned real estate subject to the Prepetition Secured Lender's first priority liens.

Prepetition Senior Agent with respect to collateral that is both Prepetition Senior Collateral and Prepetition Subordinate Collateral.

34.    *Other Secured Debt*. Except as described above, the Debtors do not believe they have any other secured debt as of the Petition Date, other than capital lease obligations and secured claims of certain taxing authorities in the ordinary course of business, all of whom will receive notice.

ii.    **Unsecured Debt**

35.    As of the Petition Date, the Debtors believe unsecured claims against the Debtors approximate $12 million. Unsecured claims against the Debtors include: (i) accrued and unpaid trade and other unsecured debt incurred in the ordinary course of the Debtors' business, (ii) unpaid amounts owed to the Debtors' vendors, and (iii) claims by landlords for unpaid rent and other obligations under the Debtors' leases.

iii.    **Equity Interests**

36.    Subortis Financing is privately owned by Subortis Retail, which, in turn, is owned indirectly by investment funds advised by Versa.

D.    **Events Leading To These Cases**

i.    **Sale of Assets to Versa**

37.    Bob's Stores and EMS were acquired by Vestis BSI Funding II, LLC (now known as Vestis Investments II, LLC ("Vestis")), an affiliate of Versa, on July 18, 2016, in predecessor chapter 11 cases being jointly administered under the caption *In re VRG Liquidating, LLC, et al.*, Case No. 16-10971 (LSS) (the "VRG Bankruptcy"). Eastern Outfitters was formed at the time of the sale to continue to operate Bob's Stores and EMS as going concerns.

ii.    **The Debtors' Sales and Financial Challenges**

38.    Following the July 18, 2016 sale, the Debtors' vendors imposed very restrictive credit terms on the Debtors' businesses. The continuing shift in consumer behavior away from traditional brick-and-mortar retailers and toward online-only stores, together with increased competition from big-box and specialty sporting goods retailers, have contributed to an industry-wide weakness in the Debtors' business segments. Inventories were depressed through December 2016, with unit inventories in certain categories down as much as 30% leaving the Debtors virtually incapable of meeting their sales plan. Only the proprietary EMS brand has continued to perform on a consistent basis. Indeed, EMS's same store sales increased by 35% year-over-year. In addition, both e-commerce businesses performed well, with Bob's Stores e-commerce sales up 113% and EMS's e-commerce sales up 24% year-over-year.

iii.    **The Debtors' Consideration of Strategic Alternatives**

39.    By the fall 2016, it became clear that, due to reduced levels of vendor support and the Debtors' constricted balance sheet, the Debtors required a solution to either inject new capital into the company or an outright sale of the company. In connection with their exploration of alternatives, the Debtors retained AP Services, LLC as turnaround advisors, and Spencer Ware was retained the Debtors' Chief Restructuring Officer, and Lincoln Partners Advisors LLC ("Lincoln") to serve as the Debtors' investment banker.

40.    Faced with operational challenges and tightening liquidity, the Debtors sought new financing or potential buyers. In September 2016, the Debtors began working with Lincoln to explore and solicit interest in a number of potential alternatives including, without limitation, the sale of all or a material business unit of the Company, equity investments in all or a portion of the business, the sale of a brand, licensing transaction, and potential liquidity enhancing acquisitions. During this process Lincoln approached approximately 47 strategic and financial

13

investors with experience or an existing business presence in the value and outdoor sports retail markets, or which had previously participated in the sale process for the Bob's and EMS assets during the VRG Bankruptcy. Ultimately, two prospective purchasers emerged: Sportsdirect and an East Coast-based buyer and licensor of brands ("Confidential Perspective Purchaser" or the "CPP")[4]. In addition, in early 2017, the Debtors retained Malfitano to solicit "equity" and "fee" based liquidation proposals from various national liquidation firms that could handle the disposition of all of the Debtors' assets.

41.    Starting in mid-October, 2016, the Debtors' management and representatives of Versa, held a series of separate meetings with Sportsdirect and the CPP to discuss various transactions then under consideration. While both prospective purchasers seemed interested in purchasing the Debtors' assets, Versa and the Debtors' management elected to pursue a deal with the CPP. After some additional diligence, the CPP extended an offer for the EMS intellectual property in exchange for a licensing fee and the opportunity to expand the brand into various other channels and new geographies. The proposed transaction was scheduled to close in late-November 2016. By agreement of the parties, the closing was pushed to late-December 2016, only to be pushed further while the Debtors awaited holiday retail store and e-commerce sales results. In January 2017, the CPP indicated they were not prepared to close without satisfaction of certain additional conditions to the sale which the Company could not satisfy.

42.    Following the termination of the CPP transaction, the Debtors contacted Sportsdirect and renewed their prior discussions. Ultimately, Sportsdirect and the Debtors entered into the LOI. The LOI contemplated that Sportsdirect would purchase all of the rights and obligations of Vestis under the Prepetition Subordinate Credit Agreement and related

---

[4] The Debtors and the CPP are parties to a confidentiality agreement, which prohibits the Debtors from, among other things, publicly disclosing the identity of the CPP.

documents for cash and other contingent consideration, provide bridge financing to the Debtors to avoid immediate liquidation of the Business, act as a "stalking horse" bidder for the assets of the Debtors, and provide debtor-in-possession financing (the "DIP Facility") to provide the Debtors with sufficient liquidity to finance certain aspects of the chapter 11 process.  As part of the LOI, Sportsdirect also agreed to refinance the obligations under the Prepetition Senior Credit Agreement in full by no later than March 15, 2017.  As discussed above, the intent is to quickly enter into definitive transaction documents, at which time the Debtors would seek approval of Sportsdirect as a stalking horse bidder, together with approval of sales and bid procedures.

43.    On January 27, 2017, Sportsdirect and Vestis closed on the assignment of the Prepetition Subordinate Credit Agreement and related documents.[5] On about January 30, 2017 Sportsdirect, extended an additional $10 million term loan to the Debtors under the Prepetition Subordinate Credit Agreement. The Debtors commenced these Cases to consummate the transactions contemplated in the LOI, close the Debtors' stores not being sold to Sportsdirect and facilitate an orderly liquidation and wind-down.

**E.    The Debtors' Goals in These Cases**

44.    Once definitive sale documentation is in place and the sale procedures have been authorized, the Debtors intend to conduct an auction process under section 363 of the Bankruptcy Code to determine if a higher and better offer can be obtained. In my view, this process will afford the Debtors a viable path for their businesses to emerge from bankruptcy largely intact and as going concerns. Furthermore, the stalking horse APA will be tested by an overbid process, which will afford the marketplace an opportunity to determine whether a higher or better transaction is available.

---

[5]  In connection with the assignment, Holdings reconstituted the Debtors' boards and appointed Mark Walsh (the CEO), Scott Hampson (the CEO) and Matthew Kahn as an independent director with authority to, among other things,  oversee the sale and restructuring process.

45.     The Debtors are confident a sale to Sportsdirect on the terms set forth in the LOI and the substantially complete asset purchase agreement, will allow these core brands to emerge as part of a stable and strong enterprise, save an estimated 1,900 jobs and position the Debtors to take advantage of the many opportunities in the markets in which they will continue to operate.

46.     After filing their petitions, the Debtors intend to operate their businesses in the ordinary course pending completion of the sale process outlined above. In the various First Day Motions, the Debtors seek relief on an expedited basis that will help preserve the value of their assets and permit them to conduct the Cases efficiently and economically.

[signature page to follow]

56181/0001-14117389v1

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _07_ day of February 2017 at _Meriden, Connecticut_

Eastern Outfitters, LLC, *et al.*,
Debtors and Debtors in Possession

By:_____
Name: Mark T. Walsh
Title:   Chief Executive Officer

# Exhibit A

**First Day Motions**

## FACTUAL BACKGROUND IN SUPPORT
## OF THE DEBTORS' FIRST DAY MOTIONS

### Facts in Support of First Day Motions

1.      In order to enable the Debtors to minimize the adverse effects of the commencement of these Cases, the Debtors have requested various types of relief in the First Day Motions filed concurrently with this Declaration. A summary of the relief sought in each First Day Motion, as well as the factual basis for each First Day Motion, is set forth below.

2.      I have reviewed each of these First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their current business operations; and (b) is essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

**A.      Joint Administration Motion.**

3.      The Debtors seek entry of an order directing the joint administration of their Cases and the consolidation thereof for procedural purposes only. The Debtors in these Cases are affiliated entities. All of the Debtors are under common management. The Debtors share many creditors and parties in interest. As a result, I believe that joint administration will prevent duplicative efforts and unnecessary expenses.

4.      I understand that the joint administration of the Cases will permit the Clerk of the Court to utilize a single general docket for these Cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in significant savings to the estates. Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates.

**B.    Employee Compensation and Benefits Motion.**

5.    The Debtors seek authority: (a) to pay accrued prepetition wages, salaries, and other compensation to their Employees (as defined below), to the extent unpaid prepetition and to continue to honor in the ordinary course of business (but not assume) certain practices, programs and policies with respect to the Employees; (b) to honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' vacation and sick time policies, severance policy to the extent required under applicable law, employee benefit plans and programs, and retirement savings program; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business; (d) to pay all related prepetition payroll taxes and other deductions; and (e) to the extent that any of the foregoing programs are administered, brokered, insured or paid through a third-party administrator or provider, to pay any prepetition claims of such administrator and provider in the ordinary course of business to ensure the uninterrupted delivery of payments or other benefits to the Employees.

6.    The Debtors' workforce is comprised of full time salaried employees ("Full Time Salaried Employees"), full time hourly employees ("Full Time Hourly Employees" and together with the Full Time Salaried Employees, the "Full Time Employees"), part-time hourly employees ("Part Time Employees"), and temporary hourly employees ("Temporary Employees" and, together with the Full Time Employees and Part Time Employees, the "Employees"). As of the Petition Date, the Debtors employ approximately (a) 403 salaried Full Time Employees and 350 hourly Full Time Employees, for a total of approximately 753 Full Time Employees; (b) 1,665 Part Time Employees; and (c) 198 Temporary Employees. In addition, approximately 12 Full Time Employees are currently on

leave. Of the Debtors' current workforce (including any on leave), 865 are employed by EMS and 1,763 are employed by Bob's. Each of the two retailers has its own payroll system.[1]

7.     All Employees are paid bi-weekly for the prior two weeks ending on the Saturday of any payroll week. Currently, the Debtors utilize three methods of payment:  direct deposit; pay cards (debit cards funded on payroll date); and "live" paper checks. About 95 Employees are currently paid via paper checks.

8.     The Debtors currently utilize Automated Data Processing ("ADP") as its third-party payroll administrator to process payroll and distribute direct deposit payments, as well as to administer certain "back end" payroll matters, such as the remittance of Payroll Taxes to local state and federal agencies. In addition, the Debtors use ADP for the administration of unemployment services.

9.     In 2016, the average gross amount funded by the Debtors with respect to Employee payrolls in each two-week period was approximately $2.1 million.

10.     The Debtors' ability to preserve the value of their assets depends on the service of their Employees. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the morale and performance of their Employees may be adversely affected. The Debtors simply cannot operate without competent, knowledgeable Employees. If the Debtors fail to pay the Employee Claims in the ordinary course, their Employees will suffer personal hardship and, in some cases, may be unable to pay their basic living expenses. This result would have a highly negative impact on workforce morale and likely would result in

---

[1]  Certain Employees at the Debtors' corporate headquarters in Meriden, Connecticut provide shared services to the two retailers (the "Home Office Employees"). These Home Office Employees are employed by Bob's Stores and administered under the Bob's Stores' payroll system. In addition, the Debtors contract with approximately 6 additional workers, who are either independent contractors or employees leased from temporary placement agencies (the "Contractors"). These Contractors are compensated outside of the Debtors' payroll system, and receive, in the aggregate, approximately $25,000 per week. Because the Contractors are critical to the Debtors' business, the Debtors seek authorization to pay prepetition amounts owing to the Contractors and to continue to employ and compensate them in the ordinary course during the pendency of these Cases.

unmanageable performance issues, thereby resulting in immediate and irreparable harm to the Debtors and their estates. Moreover, just as the Debtors depend on the Employees to operate their businesses on a daily basis, those individuals also depend on the Debtors. Indeed, the vast majority of these individuals rely exclusively on payments from the Debtors for their basic living necessities.

11.    The Debtors believe that, as of the Petition Date, there are no accrued but unfunded amounts with respect to Employees on account of accrued prepetition wages and salaries.

12.    *Independent Manager Fees*. Additionally, the Debtors pay independent member fees to Matthew Kahn, an independent director on the Debtors' Board of Managers (the "Independent Manager Fees"). Mr. Kahn is paid $4,000 per month and $10,000 per quarter for his services on the board.  To the extent there are prepetition amounts owing to Mr. Kahn, the Debtors seek authority to pay them. With the exception of Mr. Kahn, the Debtors do not pay director fees.

13.    *Employee Bonus Programs*. Prior to the Petition Date, in order to ensure optimal performance by the Employees, the Debtors implemented a number of bonus and incentive programs (collectively, the "Employee Bonus Programs") as follows:

(a)    Store Managers' Incentive Program. EMS maintains two store managers' incentive plans, one that is only applicable to store managers at certain high volume stores, and one that is applicable to store managers at all other EMS stores (together, the "EMS Store Managers' Incentive Program"). Under both plans, store managers may earn payouts for meeting or exceeding target store sales for the month. Once a monthly sales goal is attained, commissions are awarded depending on the month. Store managers at high volume stores are eligible for slightly higher commissions than store managers at other EMS stores, and are subject to higher sales targets. If sales targets are missed for one or two months but achieved for the quarter, then store managers may be paid out for the months comprising that quarter. For all stores, sales managers may also

4

earn payouts for exceeding planned customer data capture rates, planned conversion rates, planned new customer sign up rates, or units of Superfeet units sold as a percentage of footwear units sold. Aggregate payments on account of the EMS Store Managers' Incentive Program for calendar year 2016 were approximately $46,000. As of the Petition Date, the Debtors believe there are no accrued but unpaid amounts owing to Employees under the EMS Store Managers' Incentive Program.

(b)     Bob's Stores Performance Incentive Program. Bob's Stores maintains a field bonus program for store managers, assistant store managers, department managers, asset protection managers, and senior asset protection managers (together, the "Bob's Performance Incentive Program"). Department managers are eligible for payouts if they meet certain sales and other store-related targets in Bob's Stores. Eligible managers are also eligible for payouts on the basis of meeting targets for AP survey scores. Aggregate payments on account of the Bob's Performance Incentive Program for calendar year 2016 were approximately $7,700. As of the Petition Date, the Debtors believe there are no accrued but unpaid amounts owing to Employees under the Bob's Performance Incentive Program.

(c)     Bob's Stores Tuition Assistance Program. Bob's Stores offers tuition assistance (the "Tuition Assistance Program") to encourage Full Time Employees to further their education and professional development through job related coursework or work related degree programs. Tuition assistance is only granted for courses directly related to work or that go toward a job related degree. All Full Time Employees are eligible to apply for tuition assistance after completing six months of continuous service. Reimbursements under the plan are made at 75% of the total cost of tuition and lab fees up to an annual maximum of $5,000. If an Employee voluntarily terminates his or her employment within one year of accepting tuition assistance, he or she may be required to reimburse the company up to a certain amount. The Debtors' approximate tuition disbursement under the Tuition Assistance Program is $3,000 per month. As of the Petition Date, the Debtors believe there is approximately $1,500 in accrued but unpaid amounts owing to Employees under the Tuition Assistance Program

14.     *Vacation Time*. The Debtors have varying vacation policies for their Employees who are awarded or accrue vacation time and paid time off (together, "Vacation") throughout the year:

(a)     Bob's Stores. Bob's Stores field Full Time Employees are awarded vacation time annually based on years of service attained at the time of the award. Vacation time is awarded, not accrued. Full Time Hourly

Employees (who have worked an average of 30 or more hours per week in the previous vacation calendar year (February 1 – January 31) and hold a position classified by the company as full time) and Full Time Salaried Employees are eligible for vacation awards in accordance with the company's award schedule. For Full Time Salaried Employees, the award schedule provides for two weeks of vacation for one year of service, for three weeks of vacation for two years of service, and for four weeks of vacation for ten years of service. For Full Time Hourly Employees who hold a position classified by the company as full time, the award schedule provides for one week of vacation for one year of service, for two weeks of vacation for two years of service, for three weeks of vacation for five years of service, and for four weeks of vacation for ten years of service. Vacation awards for Full Time Hourly Employees are made based on the average weekly number of hours worked for all Full Time Hourly Employees during the previous vacation calendar year. Awarded vacation not used by the end of the vacation year is forfeited. Vacation award balances that remain unused at the time of separation are not paid out unless otherwise directed by state law.

(b)     <u>EMS</u>. EMS field Full Time Employees earn paid time off based on years of service. Earnings are prorated by the percentage of full time (40) hours worked each week (for example, if an employee works only 30 hours a week, that employee will earn 75% of the time a person working 40 hours a week would). Vacation days are earned on the following schedule: a maximum of ten days after 0-4 years of service, a maximum of 15 days after 5-9 years of service, a maximum of 20 days after 10-19 years of service, and a maximum of 25 days after 20+ years of service. Part Time Employees and Full Time Employees are paid for time away for bereavement (with benefits prorated for part-time employees). Paid bereavement leave is limited to five days for immediate family, three days for extended family, one day for other relatives, and one-half day for coworkers. Upon termination of employment, Employees are paid for any accrued, unused vacation time. EMS Full Time Employees are also eligible for an Adventure Leave program, which allows for up to 30 days of unpaid leave for participation in an outdoor experience, subject to prior management approval.

(c)     <u>Home Office Employees</u>. Regular full time Home Office Employees (which, as noted above, are administered under the Bob's Stores payroll) with 30 consecutive days of full time employment accrue vacation time based on accumulated service, ranging from two days for two-four months of service to 26 days for ten or more years of service. For Home Office Employees in their second through ninth year (beginning February 1), 21 vacation days are accrued for each fiscal year. Paid time off is paid at normal base salary or hourly rate. Remaining unused hours/days are not carried over into the new fiscal year, and Home Office Employees are not

56181/0001-14119112v1

paid out for unused paid time off, unless required by applicable law, specifically in Massachusetts and Rhode Island.

15.    At any point in time, Vacation is accruing or being used by Employees, making it difficult to quantify the cost of accrued Vacation as of the Petition Date. However, as of the Petition Date, the Debtors estimate approximately $480,000 in aggregate accrued and unused Vacation.

16.    *Sick Leave*.  The Debtors provide paid accrued sick time ("Sick Leave") to their Full Time and Part Time Employees as and where dictated by state law (Sick Leave Policy"). In addition, the Debtors' hourly Home Office Employees are eligible for up to four sick days each fiscal year, starting February 1 in their second year of service, which do not carry over at the end of the fiscal year, and are not paid out when employment ends. As of the Petition Date, the Employees had approximately $200,000 in the aggregate of accrued and unused Sick Leave. The Debtors will not need to make cash payments on account of Sick Leave time, except at separation of employment and where required by state law.

17.    *Non-Insider Severance Policy*.  The Debtors maintain a severance policy for certain of their non-insider Full Time Employees (the "Severance Policy"). In particular, Employees in the positions of vice president, director, associate vice president, manager, supervisors, and individual contributor are eligible to receive severance payments equal to a certain number of weeks' base pay, according to a matrix that provides for service factors of between 1.00 and 2.00. For vice presidents, the number of weeks ranges from thirteen to twenty-six, for directors and associate vice presidents, the number of weeks ranges from ten to twenty, for managers, the number of weeks ranges from eight to sixteen, for supervisors and salaried individual contributors, the number of weeks ranges from six to ten, and for hourly individual contributors, the number of weeks ranges from four to eight.

7

18.     As of the Petition Date, there were no unpaid amounts due to terminated Employees under the Severance Policy.

19.     The Debtors' Employees have a range of responsibilities, including with respect to merchandising, marketing, and store operations that are necessary to the successful sale and preservation of estate value. As such, the Debtors seek authorization to continue honoring the Severance Policy, consistent with past practices, during the pendency of these Cases and to make cash payments for severance pay in accordance with the Severance Policy upon separation of employment; provided, however, that (a) severance payments will only be made to participants employed by the Debtors from and after the Petition Date; and (b) no severance payments will be made to any insiders (as defined in section 101(31) of the Bankruptcy Code), unless separately authorized by the Court.

20.     As part of their Employee Benefits, prior to the Petition Date, the Debtors offered their Full Time Employees various standard employee benefits (the "Benefit Programs"), including, without limitation, (a) health insurance, (b) dental insurance, (c) vision plan, (d) life insurance, (e) accidental death and dismemberment insurance, (f) short-term and long-term disability insurance, (g) COBRA coverage; (h) flexible spending accounts, (i) an employee assistance program, and (j) employee discounts and pro deals. Some of these benefits are only available to Full Time Employees.

21.     Many of the Benefit Programs amongst Employees of Bob's Stores and EMS overlap. Unless stated otherwise, the amounts set forth below reflect the approximate prepetition cost of such Benefit Programs in the aggregate, which the Debtors seek to continue paying in the ordinary course of their businesses during the pendency of these Cases.

8

22.    *Medical Insurance Program*.    The Debtors offer a self-insured medical and prescription drug program (the "Health Plan") to their Full Time Employees, which is administered by Cigna. The Health Plan is approximately 70% paid by the Debtors and 30% paid by the Debtors' Full Time Employees through paycheck withholding. The Debtors also maintain a stop-loss insurance policy (the "Stop-Loss Policy") to provide protection against catastrophic losses under their self-insured medical insurance program, which is administered by Cigna. Finally, the Debtors use the brokerage services of Mercer LLC ("Mercer") in connection with the management and maintenance of their Health Plan.

23.    The average monthly cost (after taking into account Employee contributions) of maintaining the Health Plan, including administrative costs and premiums, has been approximately $380,000 in the aggregate per month. The average monthly cost of maintaining the Stop-Loss Policy, including administrative costs and premiums, has been approximately $47,000.

24.    The Health Plan administrator draws on an account maintained by the Debtors on a daily basis on account of claims paid by the administrators on the Debtors' behalf. The Debtors are unable to estimate with specificity the prepetition amounts owing in respect of the Health Plan, due to the fact that there is lag time of approximately 60 days on Employees' submissions of medical claims. However, based on historical data, the Debtors estimate that as of the Petition Date they owe approximately $730,000 in respect of "incurred but not reported" claims under the Health Plan and related administrative costs and premiums in respect of the Stop-Loss Policy (excluding amounts paid through Employee deductions), and approximately $120,000 in respect of filed claims that have not yet been paid.

9

25.    *Dental Insurance Program*.  The Debtors offer a fully-insured dental program (the "Dental Plan") to their Full Time Employees, which is administered by Cigna Dental. The Dental Plan is approximately 39% paid by the Debtors and 61% paid by the Debtors' Full Time Employees through paycheck withholding. The average cost (after taking into account Employee contributions) of maintaining the Dental Plan, including administrative costs, has been approximately $30,000 per month. The Debtors are unable to estimate with specificity the prepetition amounts owing in respect of the Dental Plan, due to the fact that there is lag time of approximately 60 days on Employees' submissions of dental claims.

26.    *Vision Insurance Program*.  The Debtors offer vision insurance to their Full Time Employees through EyeMed (the "Vision Plan"). Full Time Employees participating in the Vision Plan pay 100% of the plan premium. The average cost of maintaining the Vision Plan is approximately $4,000 per month. The Debtors estimate that as of the Petition Date they owe approximately $4,000 on account of unpaid prepetition costs in respect of the Vision Plan.

27.    *Life and Accidental Death and Dismemberment Insurance Coverage*.    The Debtors provide their Full Time Employees with basic life insurance, accidental death and dismemberment insurance, and short-term and long-term disability insurance, all of which are provided by Cigna (collectively, the "Life and Disability Plans"). The Debtors pay 100% of the costs of the Life and Disability Plans (except with respect to optional supplemental life insurance, which is 100% paid by Employees who elect such insurance benefits). In the aggregate, the average monthly cost of maintaining the Life and Disability Plans is approximately $30,000. The Debtors estimate that as of the Petition Date they owe approximately $30,000 on account of unpaid prepetition costs in respect of the Life and Disability Plans.

28.    *COBRA*.  The Debtors seek to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") in respect of former Employees and their covered dependents. Discovery Benefits, Inc. ("Discovery Benefits") is the third-party COBRA administrator for the Debtors.

29.    *Flexible Spending Accounts*.  The Debtors offer their Full Time Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Health Plan. The Debtors pay approximately $20,000 per month for these flexible spending benefits (the "Flex Benefits"). The Flex Benefits are administered by Discovery Benefits.

30.    *Employee Assistance Program*.  The Debtors offer their Full Time Employees and their family members counseling services to help resolve personal issues (the "EAP") through CMG Associates. The EAP has been funded at an average monthly cost to the Debtors of $1,000.

31.    *Employee Discounts and Deal Programs*.  Prior to the Petition Date, the Debtors offered all of their Full Time Employees and Temporary Employees, their dependents, and their immediate family members cross-brand discounts at their stores and online. The discounts range between 10-50% off the original product price, subject to certain exclusions. The Debtors also offered all of their Full Time Employees and Temporary Employees certain "Pro Deals" discounts on products offered directly through third-party vendors. "Pro Deals" can be obtained directly from the applicable vendor or through a third-party website.

32.    In addition, prior to the Petition Date, EMS Full Time Employees and Temporary Employees could rent sports equipment for free, subject to certain exceptions. At EMS, Full Time Employees and Temporary Employees could also take up to two free lessons per year for rock and ice climbing, kayaking, and telemark skiing. For the avoidance of doubt, there are no amounts owing to Employees with respect to these policies as of the Petition Date.

11

33.    _Honoring of Prepetition Benefits_. As of the Petition Date, certain obligations of the Debtors under the Benefit Programs remained unpaid. The Debtors seek authority to pay or provide as they become due all amounts in respect of the Benefit Programs described above that have already accrued. Failing to honor these obligations would have devastating consequences on the preservation of the Debtors' estates. I believe that any expenses associated with such Benefit Programs are reasonable and necessary in light of that potential attrition, loss of morale and loss of productivity that would occur if such programs were discontinued.

34.    _Retirement Plan_. The Debtors maintain a 401(k) plan (the "Retirement Plan"), administered by Prudential Retirement, through which qualified and participating Employees may defer a portion of their salary to help meet their financial goals and accumulate savings for their future. The Retirement Plan is funded by Employee contributions, and Employees pay Prudential Retirement's administrative and consulting fees. The Debtors do not match Employee contributions. The Debtors believe that the Retirement Plan is important to maintaining Employee morale. The Debtors pay approximately $45,000 in the aggregate each year for audits of the Retirement Plan. However, there has been no audit for plan year 2016, and there will not be one until Summer 2017. The Debtors do not believe they owe any prepetition amounts on account of the Retirement Plan audit.

35.    _Employee Expenses_. Prior to the Petition Date, the Debtors directly or indirectly reimbursed their Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Employee Expenses"). The Employee Expenses are incurred in the ordinary course of the Debtors' business operations and include, without limitation, expenses for meals, travel, automobile mileage and other business-related expenses. In addition, the Debtors maintain    certain    cardholder-paid    credit    cards    issued    by    American    Express

12

(the "Employee Cards") on which cardholder Employees incur and pay expenses, and are subsequently reimbursed by the Debtors after submission and approval of expense reimbursement requests.

36.    The Debtors allow Employees to utilize two methods for submitting Employee Expenses reimbursement requests. First, Employees can use an online expense report software to submit expense reports and receive reimbursement for approved Employee Expenses directly to their bank accounts. Alternatively, Employees can submit expense reports directly and receive a live check for approved Employee Expenses in lieu of a direct deposit payment.

37.    Historically, approximately $180,000 has been paid on account of Employee Expenses each month. Because a delay often occurs between the time such expenses are incurred and the time a charge is posted, or an expense reimbursement request (in the case of the Employee Cards) is submitted, it is difficult to determine with precision the aggregate amount of outstanding Employee Expenses as of the Petition Date. However, the Debtors estimate that, approximately $50,000 in Employee Expenses have not been submitted and thus remain unpaid. Absent authority to pay the Employee Expenses incurred prepetition, the Debtors' Employees could be obligated to pay such amounts out of their personal funds, which would be unfair and would hurt morale.

38.    *Employee Withholdings*. The Debtors routinely deduct certain amounts from Employees' compensation that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("FICA") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance programs and other similar programs (collectively, the "Employee Withholdings"). The amount deducted and remitted by

the Debtors in respect of Employee Withholdings is approximately $900,000 in the aggregate per month. All deductions that have accrued prepetition have been funded.

39.     In addition, the Debtors are responsible for remitting to ADP, for their own account, various taxes and fees associated with payroll pursuant to FICA and federal and state laws regarding unemployment and disability taxes ("Payroll Taxes"). The Debtors pay approximately $1,168,000 in the aggregate for employer-obligated Payroll Taxes each month. As of the Petition Date, the Debtors owe no prepetition Payroll Taxes.

40.     *Employee Administrator and Broker Obligations.*   As discussed above, the Debtors utilize ADP as the payroll administrators for the different retail businesses. For these administrative services, the Debtors pay approximately $45,000 in the aggregate per month. The payroll administrators typically bill the Debtors in arrears for associated payroll costs. As of the Petition Date, approximately $45,000 is owing to ADP in the aggregate in respect of prepetition costs and fees for payroll and administration fees.

41.     The Debtors utilize Cigna as their Health Plan, Dental Plan, Vision Plan, and Life and Disability Plan administrator. The Debtors pay Cigna approximately $15,000 per month for these administrative services. As of the Petition Date, the Debtors believe that approximately $15,000 is owed to Cigna in respect of prepetition costs and fees for these administrative services.

42.     As discussed above, the Debtors utilize CMG Associates as their EAP administrator. The Debtors prepay CMG Associates approximately $1,000 in the aggregate per month for these administrative services. As of the Petition Date, the Debtors believe that approximately $3,000 remained outstanding to CMG Associates in respect of prepetition costs and fees for these administrative services.

14

43.    The Debtors also use the brokerage services of Mercer in connection with the management and maintenance of their Health Plan. The Debtors pay Mercer approximately $6,000 in the aggregate per month for these brokerage services. As of the Petition Date, the Debtors believe that approximately $6,000 is owing to Mercer for prepetition costs and fees for these brokerage services.

44.    As discussed above, the Debtors utilize Discovery Benefits as their COBRA and Flex Benefits administrator. The Debtors pay Discovery Benefits approximately $1,000 in the aggregate per month for these administrative services. As of the Petition Date, the Debtors believe that Discovery Benefits is owed approximately $1,000 for prepetition costs and fees.

45.    I believe that the relief sought in the Employee Compensation and Benefits Motion represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates. I believe that without the relief requested in the Employee Compensation and Benefits Motion being granted, there is great risk that the Employees required for the Debtors' success will seek alternative opportunities. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to successfully conduct these Cases.

**C.    Cash Management Motion.**

46.    In the ordinary course of their business, the Debtors maintain a complex cash management system (the "Cash Management System"), which includes all activities necessary and pertinent to collecting and disbursing the Debtors' cash assets. The Cash Management System allows the Debtors to efficiently identify the Debtors' cash requirements and transfer cash as needed to respond to these requirements. The Cash Management System is important to the efficient execution and achievement of the Debtors' business objectives, and, ultimately, to maximizing the value of the Debtors' estates. The Cash Management System generally operates

similarly to the centralized cash management systems used by other large companies to manage the cash of numerous operating units in a cost-effective, efficient manner. Specifically, the Cash Management System consists of bank accounts (the "Bank Accounts"), which are maintained at PNC Bank, National Association ("PNC") and certain other banks.

47. *Collections Process.* Cash collections from sales (in store sales, ACH and incoming wires) are deposited directly into two depository accounts at PNC – one for Bob's Stores (account ending in 4786) and one for Eastern Mountain Sports (account ending in 4778) (together, the "Depository Accounts").

48. Proceeds from retail store credit card sales and other miscellaneous checks and wires are deposited by the third-party processors of those credit card or check transactions, net of certain customer returns, chargebacks and fees, directly into the respective retailer's Depository Account on a daily basis. Similarly, the proceeds from credit card and PayPal purchases made through each retailer's respective e-commerce website, net of certain customer returns, chargebacks and fees, are deposited directly into the respective retailer's Depository Account on a weekly basis.

49. The Depository Accounts are pledged to PNC pursuant to the Revolving Credit and Security Agreement dated as of July 18, 2016 (as amended, restated, supplemented or otherwise modified from time to time) by and among the Debtors, as borrowers and guarantors, and PNC (the "Revolving Loan"). Funds on deposit in the Depository Accounts are automatically swept daily to a Loan Account at PNC (account ending in 9013) and then used to pay down the Revolving Loan.

50. Several of the Bank Accounts are subject to Deposit Account Control Agreements by and among the applicable Debtor, PNC, in its capacity as agent for the Debtors' first-lien

16

lenders, and the applicable banking institution (collectively, the "Deposit Account Control Agreements"). The Debtors intend to maintain the Deposit Account Control Agreements in the ordinary course of their business and intend that they should govern the postpetition cash management relationship between the Debtors and their prepetition lenders, provided that no enforcement actions with respect to those agreements may be taken except as provided in an order of the Court.

51.    *Disbursements Process*.  Prepetition, to fund operations, the Debtors would draw on the PNC Loan Account to a main concentration account maintained by PNC (account ending in 4751) (the "Concentration Account"). From the Concentration Account, the Debtors would downstream funds to two master disbursement accounts:  One for Bob's Stores (account ending in 4743) (the "Bob's Master Disbursement Account") and one for EMS (account ending in 4698) (the "EMS Master Disbursement Account," and collectively with the Bob's Master Disbursement Account, the "Master Disbursement Accounts") at PNC as well. The Master Disbursement Accounts are zero-balance disbursement accounts.

52.    The Master Disbursement Accounts, in turn, are each linked to six zero-balance disbursement accounts at PNC for expense payables (account ending in 4735 for Bob's Stores and ending in 4671 for EMS), merchant payables (account ending in 4727 for Bob's Stores and ending in 4663 for EMS) and payroll (account ending in 4719 for Bob's Stores and ending in 4794 for EMS) (collectively, the "Disbursement Accounts"). The Disbursement Accounts are funded daily to pay checks that have been presented that day for payment as well as to fund any payroll and payroll taxes, non-payroll items relating to employee health benefits and insurance, vendor payments, sales taxes, and other expenditures as they come due. The Disbursement

Accounts are funded automatically. The Debtors make disbursements from the Disbursement Accounts directly to third parties.

53.     Pursuant to agreements between the Debtors and their lenders related to the filing of these Cases, and subject to the Debtor in Possession Credit and Security Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Facility") by and among Sportsdirect.com Retail Ltd (the "DIP Agent" and "DIP Lender") on a go-forward basis, the Debtors will no longer have access to funds in the PNC Loan Account to pay operating expenses. Instead, all collections in the Loan Account will be used solely to pay down the Revolving Loan until such time as the Revolving Loan is paid in full and, thereafter, at the election of the DIP Lender to pay down the Debtors' second lien debt or the obligations under the DIP Credit Facility. Proceeds from the DIP Credit Facility will be deposited by the Debtors into a segregated DIP Account (account ending in 6867) at PNC, which will be subject only to the liens of the DIP Agent and DIP Lender.  To pay operating expenses, the Debtors will fund to the Concentration Account from the DIP Account, and then to the Disbursements Accounts.

54.     *Intercompany Transactions*.  Prior to the Petition Date, the Debtors engaged in certain intercompany transactions in the ordinary course of business (collectively, the "Intercompany Transactions"), primarily related to allocations of their merchandise inventory. Specifically, from time to time the Debtors transfer inventory from one Debtor to another to realize business efficiencies. In addition, certain of the Debtors' funds may become intermingled as a result of their Cash Management System, as described above. These transfers are reconciled through Intercompany Transactions.

18

55.    The Debtors maintain records of transfers of cash and can trace and account for all such Intercompany Transactions. The Debtors will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

56.    If the Intercompany Transactions were discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment. Accordingly, the Debtors seek the authority to continue these Intercompany Transactions in the ordinary course of business, in a manner consistent with any Court-approved postpetition financing, and the approval of administrative priority status to postpetition Intercompany Transactions, subject only to claims with a higher priority pursuant to any interim or final order approving the Debtors' proposed DIP Credit Facility.

57.    *Existing Business Forms*. The Debtors use a variety of business forms in the ordinary course of business. To minimize expenses to their estates, the Debtors believe it is appropriate to continue to use all correspondence and business forms (including letterhead, purchase orders, invoices and joint-interest-billings statements) as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.

58.    Nonetheless, as soon as practicable after the Petition Date, the Debtors will include "Debtor in Possession" on the checks they print electronically. Further, upon depletion of the Debtors' check stock and/or business forms, the Debtors will obtain new check stock and/or business forms reflecting their status as debtors in possession

59.    In light of the substantial size and complexity of the Debtors' operations, I believe that it is critical that the Debtors continue to utilize their existing Cash Management System

19

without disruption and believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtors' estates and their creditors.

**D.      Taxes Motion.**

60.      In the ordinary course of business, the Debtors incur or collect and remit certain taxes including, among others, sales, use, franchise, property, business and occupation, as well as certain similar fees, charges, and assessments (the "Taxes and Fees"). The Debtors remit the Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the operation of their businesses and the sale of their products at store locations, or through shipments of products purchased through the Debtors' websites to customers. The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid. As of the Petition Date, the Debtors estimate that they owe approximately $753,000 in unremitted Taxes and Fees, which are comprised entirely of current tax obligations, and are not in respect of "catch-up" payments. The Debtors seek authority, but not direction, to pay all prepetition Taxes and Fees owed to the Taxing Authorities as they come due in the ordinary course of business. The Debtors estimate that the amount of accrued and unpaid Taxes and Fees should not exceed $800,000.

61.      It is my understanding that any failure to pay the Taxes and Fees could have a wide-ranging and adverse effect on the Debtors' operations as a whole, as described further in the Taxes Motion. I believe that payment of the Taxes and Fees is in the best interest of the Debtors and their estates, will not harm unsecured creditors and may reduce harm and administrative expense to the Debtors' estates.

E.    **Utilities Motion.**

62.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, telephone, water, waste disposal, and other similar services (collectively, the "Utility Services") from several utility companies (each a "Utility Company," and collectively, "Utility Companies") or brokers. Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these Cases, and as such, the Debtors seek authority from the Court prohibiting the Utility Companies from altering, refusing, or discontinuing services.

63.    Uninterrupted Utility Services are essential to the Debtors' preservation of estate value, the sale of assets, and the overall success of these Cases. The Debtors' stores, two distribution centers and corporate offices require electricity and gas for lighting, heating, air conditioning and other utilities to maintain operations. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted. Accordingly, it is essential that the Utility Services continue uninterrupted during these Cases.

64.    On average, the Debtors pay approximately $606,962.43 each month for third party Utility Services in connection with their stores, corporate offices, and distribution centers.

65.    To provide additional assurance of payment, the Debtors propose to deposit into a segregated, interest-bearing account $303,481.22, which represents an amount equal to approximately two weeks of the Debtors' average cost of Utility Services, calculated as a historical average over the past three months (the "Adequate Assurance Deposit"). The Adequate Assurance Deposit will be deposited into the segregated account for the benefit of the Utility Providers on or before the date that is 20 days after the Petition Date, and will remain there for the duration of these Cases. I believe that the Adequate Assurance Deposit coupled with

anticipated debtor-in-possession financing constitutes sufficient adequate assurance to prohibit the Utility Companies from interrupting the Utility Services.

66.     For the reasons set forth herein and in the Utilities Motion, I believe that the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**F.     Insurance Motion.**

67.     The Debtors seek authorization (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change their prepetition Insurance Policies, or enter into new policies, if necessary, in the ordinary course of business and pay all prepetition obligations in respect thereof, including brokerage and administrative fees (collectively, the "Insurance Policy Obligations");[2] and (b) continue and, to the extent necessary, revise, extend, renew, supplement, or change the Financing Program, or enter into new premium financing programs, as necessary, in the ordinary course of business and pay prepetition obligations in respect thereof. In connection with their business operations, the Debtors maintain multiple Insurance Policies that vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operate and various contractual obligations. The Insurance Policies include (a) general liability, (b) automobile liability and automobile physical damage, (c) umbrella liability, (d) excess liability, (e) cargo, (f) property, (g) foreign package, (h) flood, (i) directors and officers liability,

---

[2]  In addition to the Insurance Programs, the Debtors' have various outstanding surety bonds (the "Surety Bonds") with respect to the risks inherent in the retail industry. The Surety Bonds are issued in the aggregate face amount of approximately $1 million and guarantee the Debtors' performance of customs and excise tax and utility obligations owing to governmental units and other third parties. The Debtors request authority in their discretion to continue or renew the Surety Bonds, including to provide any credit support required to maintain the Surety Bonds, and to pay any prepetition amounts that may be owed on account of the Surety Bonds, in the ordinary course of business.

56181/0001-14119112v1

(j) employment practices liability, (k) fiduciary liability, (l) commercial crime, (m) special crime, (n) premises environmental liability, and (o) workers' compensation and employers' liability.[3]

68.     The total annual premiums under the current Insurance Policies are approximately $2,004,772.62 including all related fees and charges. These premiums are paid to the relevant insurance carriers (the "Insurance Carriers") either as annual prepayments or as installment payments, including through the Financing Program (defined below). In connection with the Insurance Policies, the Debtors have posted standby letters of credit to Wells Fargo for which the total LC balance is $1,388,742, and the total cash with Wells Fargo, taking into consideration its cash collateral, is $1,734,399. The Debtors do not believe there are any prepetition amounts owing to the Insurance Carriers with respect to the Insurance Policies.

69.     Other than environmental liability coverage, most of the Debtors insurance premiums are financed under that a Commercial Premium Finance Agreement (the "Financing Agreement") with AFCO Premium Credit LLC ("AFCO"). Pursuant to the Financing Agreement, the Debtors are obligated to make monthly payments of $190,620.52. The Debtors have made six out of ten required payments under the Financing Agreement and are current on their obligations thereunder. The Debtors will be obligated to make another payment of $190,620.52 on February 18, 2017.

70.     In connection with the procurement and maintenance of their Insurance Policies, the Debtors obtain brokerage services from Marsh USA, Inc. (the "Broker"). The Broker assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors' with the procurement and negotiation of the Insurance Policies, and

---

[3] Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their employees with coverage for injury claims arising from or related to their employment with the Debtors. The Debtors maintain an Insurance Policy for their workers' compensation benefits program through Zurich American Insurance Company (the "WC Program"). The WC Program provides benefits to all of the Debtors' employees for claims arising from or related to the employees' employment with the Debtors.

enabling the Debtors to obtain those policies on advantageous terms and at competitive rates. Historically, the Debtors have paid the Broker approximately $250,000 in the aggregate on an annual basis for its services (the "Brokerage Fees"). The Debtors do not believe there are any prepetition amounts owing with respect to the Brokerage Fees.

71.     I believe coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' estates and, in many instances, such coverage is required by various regulations, laws and contracts that govern the Debtors' business operations. Moreover, I understand that maintenance of insurance policies is required by the operating guidelines established by the Office of the United States Trustee. If the Debtors fail to perform their obligations under the Insurance Policies, Surety Bonds, and Financing Program, their coverage thereunder could be voided. The Debtors may also need to renew or replace certain of the Insurance Policies, Surety Bonds, and the Financing Program during the course of these Cases, or enter into new policies. If the Debtors do not pay prepetition amounts owing in respect of the Insurance Policies, there is a risk that the Insurance Carriers will refuse to renew the Insurance Policies. In addition, I believe that any delay in the timely payment of workers' compensation benefits under the WC Program would have a negative effect on the morale of the employees. Without the support of their workforce, the Debtors' operations would be impaired.

72.     Similarly, I believe that continuing to perform under the Financing Agreement on a postpetition basis is in the best interests of the Debtors' estates. Given the Debtors' current financial circumstances, the Debtors may have difficulty securing alternative premium financing on terms as favorable as under the Financing Arrangement. In any event, the Debtors are highly unlikely to obtain such financing on an unsecured basis. Thus, the Debtors' ability to continue performing under and to renew the Financing Agreement is essential to preserving estate value.

24

Were the Debtors to fail to honor their obligations under the Financing Agreement, AFCO could seek relief from the automatic stay to terminate the Financing Program, which, if granted, would require the Debtors to obtain replacement insurance on an expedited basis and likely at greater costs for the Debtors. Even if the Financing Program was not terminated, any interruption in the Debtors' payments could adversely affect the Debtors' ability to finance premiums for future policies.

73.    For these reasons and the reasons set forth in the Insurance Motion, I believe the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their businesses without interruption, and to preserve value for the Debtors' estates.

**G.    Customer Programs Motion.**

74.    The Debtors are requesting authorization (a) to maintain and administer certain of their Customer Programs (defined below) and honor prepetition obligations to customers related thereto in their discretion in the ordinary course of business to the extent requested herein, and (b) to continue, replace, implement, modify and/or terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate in their business judgment and in the ordinary course of business.

75.    In the ordinary course of business, the Debtors provide certain customer-related programs that engender goodwill, maintain loyalty, increase the Debtors' sales opportunities, and allow the Debtors a comparative advantage over their competitors (the "Customer Programs"). Specifically, pursuant to the Customer Programs, the Debtors offer gift cards, refunds and exchanges, coupons, loyalty programs, and other promotional offers to their customers, as well as processing customer purchases through the use of credit cards. The Debtors believe that their ability to continue the Customer Programs and to honor their obligations thereunder in the

25

ordinary course of business is essential to: (a) retaining their reputation for reliability; (b) meeting competitive market pressures; (c) maintaining positive customer relationships; and (d) ensuring customer satisfaction, all of which enhance revenue for the benefit of the Debtors' stakeholders.

76.     *Gift Cards*.  Prior to the Petition Date, the Debtors sold gift cards (collectively, the "Gift Cards"), in the ordinary course of business, to customers of both Bob's Stores and EMS. Customers can purchase Gift Cards in the Debtors' retail stores and online at www.bobstores.com or www.ems.com. In addition, both retailers routinely issue Gift Cards on account of store credits for returned merchandise. Gift Cards can be used only for in-store purchases or online purchases and only with the respective retailer from which the Gift Cards were purchased or issued. Gift card programs of this nature are commonplace and popular in the retail industry, and the Debtors' competitors offer similar programs to their customers.

77.     As of the Petition Date, the Debtors' books and records reflect an aggregate net liability in respect of Gift Cards of approximately $16.5 million, of which approximately $7.7 million is attributable to Bob's Stores and approximately $8.8 million is attributable to EMS. I understand that Gift Cards that have aged for over two years are unlikely to be redeemed, while those that are less than 90 days old are most likely to be redeemed. Based on that, the Debtors estimate that outstanding liabilities in respect of Gift Card obligations total approximately $4.8 million, of which approximately $2.8 million is attributable to Bob's Stores and approximately $1.9 million for EMS.

78.     *Refund and Exchange Program*.  Prior to the Petition Date and subject to certain exceptions, Bob's Stores and EMS generally allowed their customers to return or exchange merchandise that is in saleable condition (collectively, the "Refund and Exchange Program").

26

Items that meet certain conditions may be returned for the same form of payment originally used for the purchase.

79.     The Debtors are unable to estimate the value of their prepetition obligations with respect to the Refund and Exchange Program with precise accuracy due to the fact that returns and exchanges can be made for an extended period following the original sale. It is my understanding that the Debtors do not expect the commencement of these Cases to result in a significant deviation in the volume of returns and exchanges from that which they experienced prepetition, which averaged approximately $50,000 per month in the aggregate.

80.     *Promotional Offers and Programs*. Prior to the Petition Date, the Debtors offered various in-store and online promotional offers to customers throughout the year (collectively, the "Promotions"). The Promotions are aimed at driving sales, maintaining market competitiveness, and building brand loyalty. The Promotions provide discounts to customers, such as "percentage off," "buy-one-get-one-free," and "gift with purchase."

81.     Prior to the Petition Date, the Debtors also maintained an integrated private label credit card program whereby customers could open Bob's Stores and EMS MasterCards through First Bankcard, a division of First National Bank of Omaha, pursuant to a license from MasterCard International Inc. (collectively, the "Store Credit Cards"). Holders of Store Credit Cards accumulate points for use of the cards, which points are redeemable for rewards certificates that can be applied towards future purchases (the "Rewards Certificates"). Also, prior to the Petition Date, the Debtors offered promotional points in loyalty programs called "Best of Bob's," and "EMS Rewards" (together, the "Rewards Program"). Members of Best of Bob's earn a $10 welcome Rewards Certificate for signing up for the program, and a point for every dollar spent. For every 200 points earned, participants receive a $10 Rewards Certificate.

27

Members of EMS Rewards earn 15% off all full price items as a welcome to the program, and thereafter earn a point for each dollar spent on qualifying purchases, earning a $10 Rewards Certificate for every 200 points accumulated. In addition, members of EMS Rewards receive birthday rewards, double points events, and members-only offers and shopping events.

82.    The Debtors' books and records reflect an aggregate net prepetition liability in respect of the Rewards Certificates earned via the Store Credit Cards and the Rewards Program of approximately $10 million in the aggregate. All Rewards Certificates expire 90 days after issuance, in accordance with their terms.

83.    *Credit Card and Other Payment Processors*.    In addition to cash, the Debtors accept several other methods of payment from customers at their point of sale, including: (a) credit cards; (b) PayPal; (c) gift cards; (d) certificates; (e) checks; and (f) Amazon.com. For all methods of payment (other than a cash transaction), the Debtors receive the net customer sales less any chargebacks, returns and processing fees charged. The processing fees charged by each company vary, but are generally in the range of 1% to 4%. The fees that are owing to these companies are set off from the funds that are remitted to the Debtors on a weekly basis.

84.    Maintaining use of the credit cards and other payment mechanisms, such as PayPal and Store Credit Cards, is essential to the continuing operation of the Debtors' business because a significant amount of the Debtors' sales are made using non-cash payment methods. By this Motion, the Debtors request authority, in their sole discretion, to allow the credit card companies, PayPal, and any third-party administrators to continue to process the customer payments, including deducting chargebacks, returns, and processing fees in the ordinary course of business.

85.     I believe the relief requested in the Customer Programs Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

## H.    Shippers Motion.

86.     The Debtors seek authorization to pay certain prepetition claims for shipping, freight forwarding, consolidating, and customs duties (collectively, the "Transporter Claims"). The Debtors' business depends on the daily process of importing and shipping their products to stock the Debtors' stores and fulfill orders through their significant e-commerce businesses. In order to ensure the steady movement of products, the Debtors rely on a network of shippers, freight forwarders, and consolidators who process and ship the Debtors' merchandise (the "Merchandise") to and from the Debtors' distribution centers, customers, and stores. If the Debtors fail to pay any of the foregoing entities for charges incurred in connection with the transportation of the Merchandise, various statutes, tariffs, and agreements may permit the shippers, freight forwarders, and consolidators to assert possessory liens against any Merchandise in their possession.

87.     Merchandise that is received from overseas is shipped to various ports in the United States, cleared for customs, loaded onto railroad containers, and finally moved onto trucks, which, often with the help of consolidators, transport the Merchandise to the Debtors' distribution centers and thereafter to the Debtors' stores and customers. The Debtors are required to pay customs duty charges, which charges the Debtors pay directly without the use of an outside broker. The Merchandise can be stopped in transit if customs duties are not paid in the ordinary course. In addition, the Debtors have posted two bonds with the federal government in connection with their customs and excise tax obligations, in the aggregate amount of $600,000.

88.     As of the Petition Date, the Debtors estimate that approximately $1 million is owed in the aggregate on account of prepetition Transporter Claims. These amounts are in respect of shippers, freight forwarders, consolidators, and customs duties, and include both invoices that the Debtors have received, as well as amounts that the Debtors have not yet received, but believe have been incurred as of the Petition Date based on historical practice. Payment of the foregoing Transporter Claims will avoid disruption to the Debtors' businesses and stores, prevent the possibility of possessory liens being asserted against the Merchandise, and enable the Debtors to realize the value of the Merchandise and continue their operations uninterrupted at this critical time.

89.     Moreover, although the Debtors believe that the above aggregate amount of unpaid prepetition Transporter Claims is accurate, to the extent that additional amounts are found to be outstanding (most likely due to delayed invoicing or the timing of certain shipments), the Debtors request authority to pay such amounts in order to gain access to the Merchandise, as any disruption in the Debtors' movement of Merchandise could result in significant adverse consequences to the Debtors' businesses.

90.     For the reasons stated, I believe the relief requested in the Shippers Motion is necessary to avoid immediate and irreparable harm to the Debtors, business interruption, and to preserve value for the Debtors' estates.

I.     **Postpetition Goods Motion.**

91.     The Debtors seek confirmation of administrative expense priority status and authorization for payment of the Debtors' undisputed obligations for the postpetition delivery of goods that were ordered prepetition and that the Debtors have not canceled, declined, returned, or contested. As is typical for the Debtors' retail businesses, as of the Petition Date, the Debtors had received merchandise and have numerous open prepetition purchase orders (collectively,

30

the "Outstanding Orders") with several suppliers (collectively, the "Suppliers") for ordinary course goods that had not yet been delivered as of the Petition Date, but which the Debtors believe are integral to the Debtors' ongoing business operations. The Debtors estimate that they have over 400 open purchase orders with 25 different Suppliers for merchandise critical to their operations and store inventory. To provide protection for these Suppliers so that deliveries are not disrupted or withheld, the Debtors request entry of the Proposed Order confirming administrative expense priority status as against the Debtor liable for any Outstanding Order, and authorizing payment of the Debtors' undisputed obligations for the postpetition delivery of goods that were ordered prepetition and that the Debtors have not canceled, declined, returned, or contested.

92.    The Debtors further request that the Court confirm that, notwithstanding the relief sought in this Motion, the Debtors shall retain the right to (a) cancel a purchase order (including any Outstanding Order), (b) decline the acceptance of goods, (c) return any defective, nonconforming, or unacceptable good, and (d) contest the amount of any invoice or claims, or liens related thereto, on any grounds, as they would do in the ordinary course of their business operations.

93.    As a result of the commencement of these Cases, it is my understanding that the Suppliers may perceive a risk that they will be treated as prepetition general unsecured creditors with respect to orders placed within 20 days of the filing for shipments made after the Petition Date pursuant to the Outstanding Orders. As a result, the Suppliers may refuse to deliver critical goods to the Debtors unless the Debtors assure payment. The Debtors' businesses depends on the ability to quickly obtain necessary merchandise from their Suppliers in order to stock their stores

and fulfill online orders. The inability to maintain sufficient inventory due to the Suppliers' refusal to deliver goods could have a significant detrimental impact on the Debtors' businesses.

94.     Under these circumstances, I believe that the requested relief is necessary to permit the Debtors to obtain the timely delivery of goods they need from the Suppliers pursuant to the Outstanding Orders. It is also my understanding that this relief is noncontroversial and entirely consistent with the applicable provisions of the Bankruptcy Code. Accordingly, and for the reasons already set forth herein and in the Postpetition Goods Motion, I believe that this relief is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**J.      Critical Vendor Motion.**

95.     The Debtors seek entry of an order granting them authority to pay prepetition fixed, liquidated and undisputed claims (the "Critical Vendor Claim") of certain critical suppliers of goods, with whom the Debtors continue to do business and whose goods are essential to the Debtors' continued operations (the "Critical Vendors"). In most instances, the Debtors either do not have contractual relationships with the Critical Vendors or cannot easily find replacement providers.  Subject to conditions detailed in the motion, and to the extent possible, the Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods and services to the Debtors and their customers on the same trade terms that, or better trade terms than, such Critical Vendors offered the Debtors immediately before the Petition Date or pursuant to such other trade practices and programs that are favorable to the Debtors in their discretion.

96.     The Debtors estimate the aggregate amount of payments to be made on account of Critical Vendor Claims is approximately $5 million.

32

97.    Under these circumstances, I believe that the payment of the Critical Vendor Claims is vital to the Debtors' ability to preserve and maximize value for all stakeholders pending the sale of their business assets on a going concern basis.

**K.    Consolidated Creditor List Motion.**

98.    The Debtors seek authorization (a) to file consolidated lists of the Debtors' (i) creditors and (ii) top 40 general unsecured creditors and (b) to complete all mailings of notices, including notices of the commencement of these Cases and the meeting of creditors. The Debtors along with KCC (defined below) have identified thousands of entities and individuals to which notice of certain events or requests for relief in these Cases must be provided. My understanding is that the Debtors anticipate that such notice of events will include, without limitation, notice of: (a) the filing of the Debtors' voluntary petitions; (b) the initial meeting of the Debtors' creditors in accordance with section 341 of the Bankruptcy Code; (c) any applicable bar dates for the filing of claims; (d) in certain circumstances, sale and plan related matters (collectively, the "Notices").

99.    The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive Notices and other similar documents. The Debtors believe that the information, as maintained in the Debtors' computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with Notices in these Cases.

100.    The Debtors have filed an application (the "KCC Retention Application") seeking the retention and appointment of Kurtzman Carson Consultants LLC ("KCC") as the Debtors' claims and noticing agent in the Cases. If the KCC Retention Application is granted, KCC will, among other things: (a) assist with the consolidation of the Debtors' computer records into a

33

creditor and security holder database; and (b) complete the mailing of Notices to the parties in these databases.

101.    It is my understanding that filing the lists in the format or formats currently maintained in the ordinary course of business will be sufficient to permit KCC to notice promptly all applicable parties. Further, I believe that the requested relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these Cases.

**L.    Section 156(c) Application.**

102.    The Debtors seek authorization and approval of the retention and appointment of KCC as claims and noticing agent for these Cases. Prior to the selection of KCC as claims and noticing agent, the Debtors obtained and reviewed engagement proposals from three other claims and noticing agents to ensure selection through a competitive process. I believe, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.

103.    In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I believe that the appointment of KCC as claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

# Exhibit B

## Prepetition Organizational Chart

# Eastern Outfitters, LLC Corporate Structure



Subortis Retail Holdings, LLC (DE)

100%

Subortis Retail Financing, LLC (DE)

100%

Eastern Outfitters, LLC (DE)

100%

Eastern Mountain Sports, LLC (DE)

Subortis IP Holdings, LLC (DE)

Bob's Stores, LLC (DE)

Bob's/EMS Gift Card, LLC (VA)

*The shaded boxes are Debtors in these Cases*